**In re FAMOUS RESTAURANTS, INC., Debtor.**

**Bankruptcy No. 92–11160–PHX–SSC.**

United States Bankruptcy Court, D. Arizona.

Sept. 10, 1996.

Michael E. Lindsay, Cohen, Brame & Smith, P.C., Denver, CO, Movant.

Patrick R. Barrowclough, Kalish Forrester, P.C., Phoenix, AZ, for Movant.

Sean P. O'Brien, Gust Rosenfeld, Phoenix, AZ, for Respondent, Heller Financial.

Cathy Reece, Fennemore Craig, Phoenix, AZ.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### I. *Preliminary Statement*

This is the final analysis of the rather prolonged and convoluted history concerning the quest of the law firm of Cohen, Brame & Smith (the "Firm") to recover attorneys' fees and costs as to its representation of the Debtors.[1] The Firm has abandoned any request for compensation as an administrative expense of the Debtors' bankruptcy estates. The Firm's most recent application focuses on 11 U.S.C. § 506(c) and the request to surcharge the collateral of Heller Financial, Inc. ("Heller"), the secured creditor of the Debtors. The Court conducted Bankruptcy Rule 7016 conferences and held evidentiary hearings on August 14, 1995, and December 13, 1995. Other than the Motion for Enforcement of Consensual Property Surcharge, the Response by Heller, and Reply by the Firm, the parties requested no additional briefing in this matter.[2] The parties also filed Stipulated Facts regarding Contested § 506(c) Surcharge, which the Court has considered in its decision.[3]

After the conclusion of the evidentiary hearing on December 13, 1995, this Court took the matter under advisement.

In this Memorandum Decision, this Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the *Rules of Bankruptcy Procedure.* The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334 and 157.

### II. *Factual Discussion*

The Firm is located in Denver, Colorado, and represents a significant number of public and private businesses, including numerous restaurant companies. The Firm has represented the Debtors and their predecessors-in-interest in general corporate matters since 1979. Roger C. Cohen, a shareholder and director of the Firm, has been licensed to practice law in the state and federal courts of Colorado since 1961. Mr. Cohen was the lawyer at the Firm principally responsible for the legal services provided to the Debtors. Other lawyers at the Firm also ren-

---

1. The jointly administered proceedings include: (1) Famous Mexican Restaurants of Idaho, Inc., Case No. 92–11153; (2) Famous Mexican Restaurants of Utah, Inc., Case No. 92–11154–PHX–SSC; (3) Famous Mexican Restaurants of Arizona, Inc., Case No. 92–11155–PHX–SSC; (4) Famous Restaurants of Anchorage, Inc., Case No. 92–11156–PHX–SSC; (5) Garcia's of the Carolinas, Inc., Case No. 92–11157–PHX–SSC; (6) Fiesta Enterprises, Inc., Case No. 92–11158–PHX–SSC; (7) Garcia's Restaurants, Inc., Case No. 92–11159–PHX–SSC; (8) Famous Restau-

rants, Inc., Case No. 92–11160; (9) BGB Investment Co., Case No. 92–11161–PHX–SSC; and (10) Famous Fish Restaurants, Inc., Case No. 92–11163–PHX–SSC.

2. The Motion for Enforcement is Docket Entry No. 922; the Response, Docket Entry No. 935; and the Reply, Docket Entry No. 938.

3. Docket Entry No. 966.

dered services to the Debtors. Mr. Cohen was a director of Famous Restaurants, Inc., and Famous Restaurants of Utah, Inc., two of the Debtors herein. Mr. Cohen resigned as director on September 9, 1992.[4]

On September 16, 1992, each of the Debtors filed a Chapter 11 bankruptcy petition in the District of Arizona. Fennemore Craig, P.C. ("Fennemore Craig") was approved by the Bankruptcy Court as general bankruptcy counsel for the Debtors. Upon the filing of their bankruptcies, the Debtors requested that the Firm continue to represent them with respect to corporate, securities, and real estate matters.[5] The ability of Fennemore Craig to provide legal services to the Debtors in the aforesaid matters was adversely affected by their lack of background in the business affairs of the Debtors, although Fennemore Craig had the expertise in these areas of practice.[6]

The Firm agreed to provide such continued services under the same compensation arrangement that existed prior to the filing of the Debtors' bankruptcy petitions, with the services to be charged at the standard hourly rates for the time spent, and reimbursement for costs, disbursements and other expenses incurred by the Firm.[7]

On September 18, 1992, this Court executed an Interim Financing Order (the "Interim Financing Order"). The Interim Financing Order was the product of successful negotiations between the Debtors and Heller, and those parties indicated their consent to and approval of the Interim Financing Order in writing.[8]

Paragraph 4 of the Interim Financing Order provides as follows:

Except as otherwise provided in paragraph 28 herein, in consideration for [Heller's] performance hereunder the surcharge provisions of Section 506(c) of the Code and the enhancement of collateral provisions of Section 552 of the Code shall not be imposed upon [Heller] or its collateral.[9]

Paragraph 28 of the Interim Financing Order also provides:

Notwithstanding any other provision of this Order, [Debtor] is entitled to utilize the proceeds of the Post–Petition Indebtedness, Pre–Petition and Post–Petition Collateral, or any cash or cash proceeds in which [Heller] has a lien or interest, *and,* to the extent not paid from the proceeds identified above, to seek a surcharge against [Heller's] Pre–Petition and Post–Petition Collateral, *to pay [Debtor's] professional fees and costs which are approved by the Court* as follows: (a) fees and expenses incurred by Fennemore Craig up to a maximum total of $350,000.00 (provided that the unapplied retainer of approximately $45,000.00 from [Debtor] that was held by Fennemore Craig at the time of the filing of petitions shall count as part of the $350,000.00), (b) fees and expenses incurred by [the Firm] up to a maximum total of $5,000.00 per month, and (c) fees and expenses incurred by Hanover Associates Inc. up to a maximum total of $25,000.00 per month. All entitlements discussed in this paragraph shall survive the termination of [Heller's] agreement to lend money or otherwise extend credit to [Debtor] or [Debtor's] ability to borrow money and seek financial accommodations from [Heller].[10]

On October 6, 1992, the Debtors filed an application to employ the Firm as special counsel pursuant to 11 U.S.C. § 327(e).[11] At its own risk, the Firm continued to render postpetition services to the Debtors.

At a hearing conducted on December 22, 1992, this Court noted the objections of the United States Trustee and the Unsecured

4.  Docket Entry No. 966, ¶¶ 1–6.

5.  *Id.* ¶¶ 7–9.

6.  *Id.* ¶ 9.

7.  *Id.* ¶¶ 9–10.

8.  *Id.* ¶¶ 11–12.

9.  Movant's Ex. 5, ¶ 4. A copy of the original Interim Financing Order was admitted into evidence at the August 14, 1995 evidentiary hearing, and is also attached to the Stipulated Facts as Exhibit A.

10.  Movant's Ex. 5, ¶ 28 (emphasis added).

11.  Docket Entry No. 43.

Creditors Committee to the retention of the Firm and rendered an extensive decision on the record denying the Firm's employment as special counsel to the Debtors. The Court noted that Mr. Cohen had been a director of several of the Debtors up to one month prior to the filing of the bankruptcy petitions. As such, Mr. Cohen had apparently been part of the process in selecting his Firm as counsel. Mr. Cohen would naturally want to defend his business decisions while a director, which role was not consonant with any counsel representing the Debtors in their new roles as fiduciaries for creditors and interested parties. The Firm would also want to defend its prior legal analyses, such as the preparation of filings for the Securities and Exchange Commission and other corporate documents, particularly in light of the Debtors' financial deterioration and inability to enter into an out-of-court workout with Heller. There was also the likelihood that the Firm had received a substantial prepetition preference. For instance, the Debtors' Statement of Financial Affairs indicated that the Firm received $373,188.89 in payments within the year preceding the Debtors' September 16, 1992 petition date.[12]

The Court entered its order denying the employment of the Firm as the Debtors' special counsel on January 25, 1993.[13] The

12. Docket Entry No. 51, Statement of Financial Affairs, Item 3b.

13. Movant's Ex. 6. *See also* Docket Entry No. 177.

14. Movant's Ex. 10. *See also* Docket Entry No. 230.

15. Movant's Ex. 2. *See also* Docket Entry No. 712.

16. 11 U.S.C. §§ 503(b)(1) and (4) provide:
    (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
        (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; [and]

    . . . . .

        (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allow-

Debtors filed an appeal from the Interim Financing Order.[14]

On July 30, 1993, the Debtors filed an application seeking compensation for the Firm on a number of grounds (the "Application").[15] The Application sought recovery of an administrative expense pursuant to 11 U.S.C. §§ 503(b)(1) and (b)(4).[16] The Application also requested relief for the Firm pursuant to 11 U.S.C. § 506(c).

On September 28, 1993, Heller filed an objection to the Application opposing recovery of attorneys' fees and costs by the Firm as either an administrative expense or collateral surcharge.[17] On September 29, 1993, the United States Trustee for the District of Arizona filed her comments in opposition (the "Comments") to the Application.[18]

On November 4, 1993, Heller withdrew its objection to the Firm's Application.[19] At a hearing on November 5, 1993, Heller's Arizona counsel stated Heller's position on the record. Counsel stated:

> My understanding is solely if the court approves the administrative expense of this application then [Heller] will pay those fees.[20]

Upon further request for clarification by the Firm from Arizona counsel, Heller's counsel then stated:

able under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]
However, any compensation under § 503(b)(4) was predicated upon a finding that the creditor which requested its attorneys' or accountants' fees and costs had made, for instance, a "substantial contribution in a case under chapter . . . 11 of this title[.]" *See* 11 U.S.C. § 503(b)(3)(D).

17. Docket Entry No. 777.

18. Docket Entry No. 779.

19. Docket Entry No. 825.

20. Movant's Ex. 7 at 5, lines 23–26.

If the court approves the application or surcharge Heller would be prepared to follow the court's order.[21]

. . . . .

I think as far as I am aware the only agreement was assuming this application is granted by the court then in that situation we will step up and pay those fees.

If on the other hand, this court decides that the fee application should not be granted then we will not be responsible for the fees.[22]

The Firm and the Court then engaged in an extensive discussion concerning the Firm's position as to why it should still be compensated although its retention as special counsel had never been approved. The Firm argued that it could render services, at some reduced level, in the ordinary course of the Debtors' business without any employment order. The reduced level of services need only be approved by the Court for reasonableness. Once the Court approved the compensation as reasonable, the Firm argued that it could then seek recovery from Heller pursuant to the Interim Financing Order and 11 U.S.C. § 506(c). Fennemore Craig, counsel for the Debtors, stated that it was in agreement with the Firm's analysis under Section 506(c).[23]

The attorney with the United States Trustee's Office noted that she was disturbed that the Firm had continued to render services even though its employment as special counsel had been denied. Moreover, she stated that although the Firm was only supposed to render services as special counsel in the general corporate area, the Firm had expended a considerable amount of time and effort on the Debtors' reorganization issues and matters; that is, of the $48,000 in attorneys' fees and costs incurred by the Firm, the sum of $20,000 was for reorganization issues and matters. As such, the Firm could not claim that the services were rendered in the ordinary course of the Debtors' business or were simply incidental in nature.[24] The attorney for the United States Trustee's Office also stated that if the Firm sought compensation pursuant to Section 503(b)(1) or Section 506(c), the Firm had to be employed as special counsel for the Debtors.[25] Of course, the Court had denied such employment as of January 25, 1993.

The Debtors continued with the prosecution of the appeal concerning the denial of employment of the Firm. The only other parties to the appeal were the Official Unsecured Creditors' Committee of the Debtors and the United States Trustee for the District of Arizona. The Debtors, the Unsecured Creditors' Committee and the United States Trustee stipulated in June 1994 that the Debtors' appeal on behalf of the Firm should be dismissed.[26] On or about June 25, 1994, the appeal was dismissed by order of the Arizona Federal District Court.[27] Therefore, this Court's order denying the Firm's employment as special counsel was no longer subject to being revisited or collaterally attacked.

The August 14, 1995 and December 13, 1995 evidentiary hearings before this Court focused on a number of additional critical factual issues: (1) did the Interim Financing Order serve as the requisite consent of Heller to have its collateral surcharged?; (2) did the January 10 and 11, 1993 discussions between the agent for the Debtors and a representative of Heller serve as an independent basis for the requisite consent of Heller for a Section 506(c) surcharge?; and (3) did the withdrawal of Heller's objection to the initial Application of the Firm bar Heller from subsequently objecting to the Firm's current Motion for Enforcement of Consensual Surcharge?

As to the evidence presented on the first factual issue concerning the Interim Financing Order, the parties focused on the language in the Interim Financing Order which

21. *Id.* at 6, lines 24–26.

22. *Id.* at 7, lines 17–25.

23. *Id.* at 29, lines 1–11.

24. *Id.* at 31–33.

25. *Id.* at 33–34.

26. Movant's Ex. 11.

27. Movant's Ex. 12.

provided that the Debtors' "professionals fees and costs which are approved by the Court" would be paid.[28]

Although counsel for the Debtors testified that "approval" of the fees and costs did not necessarily, in her mind, require employment of the professional, Heller's counsel testified that Heller strenuously objected to the retention of the Firm as counsel for the Debtors, both prepetition and postpetition. Heller was concerned about the Firm's connection with the Debtors, since Mr. Cohen of the Firm was also, almost to the point of filing of the bankruptcy petitions, a director of several Debtors. Heller questioned the ability of the Firm to represent the Debtors in their new role as fiduciaries to all creditors and interested parties. Heller also did not want its collateral utilized to pay all postpetition debts or obligations of the Debtors, and Heller specifically negotiated those debts to be paid with its collateral. Heller's counsel testified that the Interim Financing Order in Paragraph 28 only carved out *potential* payments of those professionals that had sought employment pursuant to 11 U.S.C. §§ 327(a) or 327(e). Approval of the Court was still necessary. Therefore, Heller's counsel concluded that pursuant to the Interim Financing Order, no fees or costs could be paid to any professional that was not employed pursuant to an order of the Bankruptcy Court. Debtors' counsel testified that professionals were usually required to be employed before they could be paid, but noted that certain courts had held that an attorney seeking a Section 506(c) surcharge need not be employed as a professional pursuant to Section 327.[29]

Every professional listed in Paragraph 28 of the Interim Financing Order had sought employment pursuant to 11 U.S.C. § 327. Only the Firm had its employment denied. Also the party which the Debtors sought to surcharge, Heller, specifically interpreted the Interim Financing Order as requiring employment of the professional before the fees and costs could be paid. Therefore, this Court concludes from a factual standpoint that the "approval" language in the Interim Financing Order required, among other things, the Court's approval of the Firm's employment.

As to the second factual issue, the parties presented evidence as to the January 10 and 11, 1993 discussions between the Debtors' agent[30] and a representative at Heller.[31] The Debtors' agent was retained prepetition to effectuate an out-of-court settlement with Heller. Postpetition, the Debtors' agent assisted in negotiating a plan of reorganization.[32] The Debtors' agent also believed that Mr. Cohen of the Firm was still one of the Debtors' directors at the time the decision was made as to the services to be rendered by Fennemore Craig, the Debtors' bankrupt-

28. Movant's Ex. 5, ¶ 28; *see supra* notes 9–10 and accompanying text.

29. At the time she testified, she did not cite any specific authority for this proposition.

30. The parties stipulated that Mr. Hartwell McIntyre Gardner's testimony could be presented by way of deposition transcript. Mr. Gardner resides in Connecticut and could not attend the hearings before this Court. *See* Movant's Ex. 1. Because certain objections were noted at the time of the deposition, the Court will also rule on those matters at this time. Movant's Ex. 1 at 14, lines 2–5, objection sustained—lack of foundation; at 18, lines 15–18, objection sustained—lack of foundation; at 19, line 2, objection sustained—lack of foundation; at 19, lines 18–19, objection sustained—lack of foundation; at 20, lines 8–9, objection sustained—lack of foundation; at 20, lines 21–22, objection sustained—lack of foundation; at 27, line 20, objection overruled; at 31, lines 4–5, objection overruled.

Mr. Gardner testified at Movant's Ex. 1, page 17, lines 1–6, that the *Debtors'* employees worked with Fennemore Craig and the Firm to renegotiate the leases at a number of locations. Therefore, when Mr. Gardner testified, he focused only generally on the services rendered by the Firm and based his statements upon hearsay; that is, based upon information given to him by individuals at the Debtors. Also given the fact that Mr. Gardner was an adviser to the Debtors, no foundation was laid as to the information relied upon by Mr. Gardner to form an opinion as to whether the Firm's services were reasonable or necessary to preserve or dispose of Heller's collateral or whether the services were of benefit to Heller. Mr. Gardner conceded, for instance, that he had never received and reviewed a copy of the fee application of the Firm. *Id.* at 37, line 24, to 38, line 11.

31. The representative for Heller was Hugh Wilder.

32. Movant's Ex. 1 at 9, lines 10–20.

cy counsel, and the services to be rendered by the Firm as general corporate counsel.[33] The Debtors' agent also conceded that the legal services rendered by the Firm included determining whether the Debtors had a lender liability claim against Heller, which services did not benefit Heller.[34]

As to the conversations between the Debtors' agent and a representative of Heller in January 1993, the Debtors' agent testified that he was aware that the Firm's employment had not been approved by this court on the basis of a "conflict," [35] and that he engaged in discussions with Heller's representative to determine an alternative basis to pay the Firm.[36] However, Heller did not provide the unconditional consent that the Debtors' agent or the Firm sought. The only agreement that was reached was simply if the Court approved the payment to the Firm "on some basis within the dollar amount of the parameters that were outlined," Heller would pay the Firm's attorneys' fees and costs.[37]

With respect to the third factual issue concerning Heller's withdrawal of its objection to the Debtor's Application as to the Firm's attorneys' fees and costs, the Firm presented evidence concerning the October 22, 1993 letter forwarded to Heller's Arizona counsel, which stated in part:

Heller's objection to this application was unexpected and, as shown below, a breach of Heller's express agreement to not object to the application.

· · · · ·

During discussions held on January 10 and 11, 1993, concerning this matter, Hugh Wilder agreed on behalf of Heller that Heller would not object to the filing of an application by this [Firm] for payment on the basis of substantial contribution, and that if the Court allowed for such payment, Heller would abide by its original agreement in the Interim Financing Order for

the payment of not more than $5,000 per month....[38]

Please consider this letter this firm's demand that Heller immediately withdraw its objection to the pending Application and, for the purpose of remedying any negative impact which the objection may have already had, file a pleading with the court fully reversing Heller's previous position concerning the same. Should Heller fail to take such action and [the Debtors'] pending application be denied, we will immediately file suit against Heller including, without limitation, claims for breach of contract, tortious interference with business relations, breach of duty of good faith and fair dealing, and fraudulent misrepresentation.[39]

This letter is self-serving. The Firm clearly wanted Heller to withdraw its objection, yet many of the statements made in the letter were not supported by the evidence before this Court. For instance, the letter describes an "express agreement" to not object to the Application and to permit the Firm to recover on the basis of a "substantial contribution" to the estate pursuant to 11 U.S.C. § 503(b)(4). In fact, this Court has concluded that the "agreement," if any, was conditional or limited and required the Court's approval of the employment of the Firm and any attorneys' fees and costs to be paid to the Firm. Heller questioned whether the Firm would ever be able to recover under Section 503. The Firm and the Debtors' agent also used the term "substantial contribution" to the estate, and only if the Firm made such a showing to the Court would the Firm be paid. Such language has nothing to do with a secured creditor agreeing to have its collateral surcharged under Section 506(c). Because the Firm drafted the letter and did not refer to a Section 506(c) surcharge therein, the letter seriously undermines the Firm's argument that a Section 506(c) surcharge was ever discussed or

33. *Id.* at 24–25.

34. *Id.* at 31–32.

35. *Id.* at 15–16.

36. *Id.* at 34.

37. *Id.* at 35, lines 16–18.

38. Respondent's Ex. A, at 1.

39. *Id.* at 1–2.

agreed to by Heller. Finally, although the Firm, at one point in time, had asserted a claim pursuant to 11 U.S.C. § 503(b)(1) or (b)(4), the Firm withdrew its request for compensation under said Sections. Therefore, the letter has no evidentiary effect as to the *Section 506(c) surcharge* issue.

When Heller did withdraw its objection to the Debtors' Application concerning the Firm's attorneys' fees and costs, it was also done without prejudice. Counsel for Heller credibly testified that Heller saw no reason to engage in separate litigation in another forum with the Firm, on the basis of fraud, breach of contract *or* similar allegations, when the United States Trustee's Office was already objecting to the Firm being paid.

Finally, Heller withdrew its objection to the Application on November 4, 1993; the Firm filed its current Motion for Enforcement on June 7, 1994; and the Debtors withdrew, by way of stipulation, their appeal of this Court's order denying the Firm's employment in June 1994. Given the number of months which elapsed between the various events, the Firm has made no showing that it waived certain rights or took certain actions as a result of anything that Heller proposed or did. Moreover, this Court concludes that the Firm simply took a calculated risk that it would recover its attorneys' fees and costs although its employment was denied.

Concerning the actual Application for payment of the Firm's attorney's fees and costs, the Court has reviewed a number of pleadings and considered the testimony of Mr. Cohen before this Court.[40] The initial Application filed by the Firm with the Court was deficient in a number of ways.[41] First, the Firm provided no detailed description of the

services rendered. Such entries as "correspondence with Mr. Mullen," "Telephone Conference with Mr. Gardner," "Telephone Conference with Mr. Mullen," "Research and Draft Memorandum," and "Review Fennemore Craig Memorandum" provided no guidance to this Court as to the legal services rendered by the Firm.[42] Moreover, the Court advised the Firm of the Application's deficiencies at the November 5, 1993 hearing.

The Firm then filed, on February 22, 1994, a Memorandum which attached the Firm's slightly more detailed billing statements.[43] An entry such as "correspondence with Mr. Mullen" became "Correspondence with Mr. Mullen Re: Bank and Green Leaf"; "Telephone Conference with Gardner" became "Telephone Conference with Mr. Gardner Re: Bank" or "Telephone Conference with Mr. Gardner Re: Purchase."[44] However, many entries were still not adequately explained, such as 1.5 hours for "Research and Consideration of Litigation"; 1.25 hours to review "file materials" on "Green Leaf," "Lender Liability," and "Cardinal"; 1.25 hours on "Consideration of Lender Liability Claim"; 1.50 hours on "Prepare Memorandum Re: Various Aspects of Bankruptcy"; 1.25 hours for "Preparation for and Conference with Mr. Mullen Re: Green Leaf and Heller"; 1.00 hour for "Telephone Conferences with Messrs. Mullen and Gardner Re: Green Leaf, Heller and Lender Liability"; 1.00 on "Consideration of Alternatives Re: Sale of Company"; and 1.50 hours for "Correspondence with Green Leaf and Heller Re: Sale."[45]

Finally, at the time of trial, Mr. Cohen testified as to the services rendered and provided additional exhibits which provided an overview of the services rendered. For in-

---

**40.** The Court has reviewed the billing statements to Movant's Ex. 2; the Firm's Memorandum in Support thereof, Docket Entry No. 892; and Movant's Exs. 3–4. Mr. Cohen testified on August 14, 1995.

**41.** Movant's Ex. 2.

**42.** *Id.* at "Heller Financial and Reorganization" invoice, dated March 31, 1993; "RCC" entries on October 12, 1992, October 27, 1992, October 28, 1992, October 30, 1992, November 9, 1992, November 10, 1992, and November 16, 1992.

**43.** Docket Entry No. 892.

**44.** Compare Movant's Ex. 2 with Docket Entry No. 892, "Heller Financial and Reorganization" invoice, dated March 31, 1993; "RCC" entries on October 12, 1992, October 27, 1992, October 28, 1992, and October 30, 1992.

**45.** *See supra* note 44 for documents to compare, except that these are "RCC" entries on October 28, 1992, November 10, 1992, November 26, 1992, November 30, 1992, December 2, 1992, December 7, 1992, and December 8, 1992.

stance, under the category of "Heller Financial, Bankr. Reorganization and Related Matters," for which the Firm incurred $20,335 in attorneys' fees, the Court learned that such services were done solely at the request of the "Board of Directors and Officers of the Debtors" and that the Firm considered the purchase offers of Heller and Green Leaf Ventures for Debtors' businesses and whether the Debtors had a lender liability claim against Heller.[46] Mr. Cohen testified that he estimated that 20 percent of the services in the "Heller Financial" category considered the lender liability claim *against* Heller. However, such evidence does not reflect that the legal services were reasonable or that they benefitted Heller or assisted Heller in the preservation of its collateral. Rather, the Firm was rendering broad-based services at the request of, and for the benefit of, the Debtors.

### III. *Legal Issues*

I. Whether the Firm may pursue a Section 506(c) surcharge although its request to be appointed special counsel was denied.

II. Whether Heller consented to the use of its collateral to pay the Firm's attorneys' fees and costs.

III. Whether Heller is barred by the doctrines of waiver or estoppel from asserting any objection to the Firm's Section 506(c) surcharge.

### IV. *Legal Analysis*

I. Whether the Firm may pursue a Section 506(c) surcharge although its request to appoint special counsel was denied.

The Firm initially argues that it is entitled to compensation pursuant to 11 U.S.C. § 506(c), which provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c) (1996). The Firm principally relies on the decision of *Central Bank of Mont. v. Cascade Hydraulics & Util.*

*Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.)*, 815 F.2d 546 (9th Cir.1987), for the proposition that the Firm is entitled to compensation.

In the *Cascade Hydraulics* case, Central Bank had a prepetition perfected security interest on the debtor's goods, merchandise, and inventory. When the debtor filed its bankruptcy petition, Central Bank objected to the use of its cash collateral. Although Central Bank subsequently stipulated to the use of its cash collateral, it agreed that only certain limited administrative expenses would be paid. The parties continued with the arrangement for a period of five months, at which time the debtor proposed to liquidate its assets via a plan of reorganization. *Cascade Hydraulics,* 815 F.2d at 547. After the sale, the bankruptcy court ordered that certain administrative expenses be paid, including $6,752.67 in attorney's fees. *Id.* The decision does not state whether the attorney's fees were those of debtor's counsel, although presumably that was the case.

The *Cascade Hydraulics* court enunciated two general principles of bankruptcy law: (i) "encumbrances" are paid prior to administrative expenses, and (ii) administrative expenses may not generally be charged against a secured creditor's collateral. *Id.* at 548. Under the Bankruptcy Act, the exceptions to the second general principle were:

> (1) administrative expenses incurred primarily for the benefit of the secured creditor;
>
> (2) administrative expenses caused by the secured creditor; and
>
> (3) administrative expenses consented to by the secured creditor.

*Id.* The Bankruptcy Code has codified the exceptions in 11 U.S.C. § 506(c), with the requirement that the debtor must show the expenses are:

> (1) reasonable;
>
> (2) necessary; and
>
> (3) beneficial to the secured creditor.

*Id. See also Treasurer of Snohomish County, Wash. v. Seattle First Nat'l Bank (In re Glasply Marine Indus., Inc.)*, 971 F.2d 391,

---

**46.** Movant's Ex. 3 at 7–8 and Movant's Ex. 4 at 2, ¶ 7.

393–94 (9th Cir.1992); *Lines v. North Coast Prod. Credit Ass'n (In re James E. O'Connell Co.),* 893 F.2d 1072, 1074 (9th Cir.1990).

In the *Cascade Hydraulics* case, the debtor made no showing that the costs or expenses were reasonable or necessary. On the benefit issue, the court concluded that the debtor must show in "quantifiable terms that it expended funds directly to protect and preserve the collateral." The *Cascade Hydraulics* court noted that "section 506(c) is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the debtor's estate." *Cascade Hydraulics,* 815 F.2d at 548. The debtor's broad assertions that Central Bank benefitted from the adequate protection payments or that Central Bank's cooperation with the debtor was a benefit were insufficient to meet the benefit provision of the test. *Id.* The debtor's ordering of additional inventory and the debtor's submitting of bimonthly statements to Central Bank, without more, simply represented an incidental benefit to Central Bank and did not reflect a direct correlation between Central Bank's benefit and the disposition or preservation of its collateral. *Id.* at 549.

■ Applying the *Cascade Hydraulics* case to the facts herein, this Court concludes that the Firm has failed to meet the Section 506(c) test. Under the first prong as to whether the expenses were "reasonable," a review of the Firm's billing statements and the exhibits at trial still reflect inadequate documentation to show that the compensation requested for the services rendered was reasonable. At the November 5, 1993 hearing, this Court engaged in an extensive discussion with the Firm's counsel noting the deficiencies in the Firm's Application. Although certain exhibits at trial assisted the Court in obtaining a better idea of what the Firm did, the evidence presented was still inadequate.[47] The Court expected a detailed description of all services rendered, the person performing the services, etc. Instead, the Firm presented a broad-based analysis, such as the fact that $20,220.50 was expended on Heller and reorganization issues. These services included an analysis of the

Debtors' lender liability claim against Heller, and negotiations with the purchasers of the Debtors' assets. Only the directors and officers of the Debtors requested that such work be done. The Firm also included in the "Heller category" review of the Debtors' plan and disclosure statement even though the Debtors had already had Debtors' bankruptcy counsel prepare said documents with the assistance of Debtors' business people. The Debtors' agent also had not even reviewed the Application to determine the reasonableness of the fees and costs of the Firm.

■ Next, the Court must consider the denial of the Firm as special counsel in determining whether the services rendered were "necessary." Mr. Cohen was a director of several of the Debtors up to within one month of the filing of the bankruptcy petition. It would be natural to defend the business decisions that he had made previously, including the selection of the Firm to represent the Debtors. It would be natural for him and his Firm to defend the legal positions previously advocated by the Firm. Given Mr. Cohen's close relationship to the Debtors almost to the point of the Debtors' filing, the Firm's retention was not in the best interest of the estate. The Firm had also prepared Securities and Exchange Commission filings and other corporate documents for the Debtors. Since the Debtors had encountered financial problems prepetition and had been unable to effectuate an out-of-court workout with Heller, this Court certainly questioned the Firm's ability to provide legal counsel to the Debtors in corporate areas. There was also a substantial question of whether the Firm had obtained a prepetition preference. Based upon the foregoing, it is hard to understand how the Firm's services were necessary.

In fact, given the circumstances, just the opposite is true. Given the substantial issues raised by the Court concerning the Firm's employment, the Debtors' most prudent course of action should have been to retain other counsel. Certainly the Debtors did somewhat reduce their attorneys' fees and costs by using the Firm. However, the Firm

47. *See* Movant's Exs. 2–4.

presented only general statements as to the cost reduction, and no credible evidence as to a specific or quantifiable reduction. Moreover, since Heller's counsel was already extensively involved in the Debtors' reorganization and had reviewed all, or almost all, documents prepared by any of Debtors' counsel, the Debtors should have considered permitting Heller's counsel to perform many of the legal services necessary to preserve Heller's collateral. From this Court's standpoint, it appears that the Firm duplicated the services that were being performed, or could have been performed, by the Debtors' or by Heller's counsel.

On the "benefit" prong of the Section 506(c) test, the Firm has also failed to meet its burden of proof. The Firm "must establish in quantifiable terms that it expended funds *directly* to protect and preserve the collateral." *Id.* (emphasis added). Although the services rendered by the Firm may have been of some incidental benefit to Heller, given the broad description of the services rendered and the services already rendered by Heller's counsel, this Court concludes that there was no direct correlation between the services rendered by the Firm and the actual disposition or preservation of Heller's collateral. In essence, the Firm was representing the Debtors—nothing more. Thus, the incidental benefits derived by Heller from the Firm's representation do not trigger Section 506(c). *Id.* Moreover, such standard potential administrative expense claims should not be transformed into Section 506(c) claims when the Court does not approve them as administrative expenses. *See FDIC v. Jenson (In re Jenson)*, 980 F.2d 1254, 1260 (9th Cir.1992) (holding that § 506(c) "was not intended as a substitute for recovery of normal administrative expenses from the debtor's estate,") (citing *In re Proto–Specialties, Inc.*, 43 B.R. 81, 83 (Bankr.D.Ariz.1984)); *Cascade Hydraulics*, 815 F.2d at 548 (holding that § 506(c) "is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the debtor's estate.")

This Court has denied compensation to the Firm based upon the Firm's failure to meet the Section 506(c) test. The Court should also consider to what extent a professional may recover under Section 506(c) although the professional's employment has not been approved by the bankruptcy court.

In another Ninth Circuit decision, *North County Jeep & Renault, Inc. v. General Elec. Capital Corp. (In re Palomar Truck Corp.)*, 951 F.2d 229 (9th Cir.1991) (per curiam), *cert. denied*, 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992), a proposed purchaser of the estate's assets continued to operate the debtor's business pending the bankruptcy court approval of the proposed purchaser's offer. Ultimately, the assets were sold to a different party and the proposed purchaser sought a Section 506(c) surcharge against the collateral of the secured creditor for the costs and expenses incurred by the proposed purchaser prior to the sale. Although the proposed purchaser did not seek *prior* bankruptcy court approval of its administrative expense claim before expending the costs and expenses to keep the debtor's business going, the bankruptcy court did subsequently approve the administrative expense claim. *Palomar Truck*, 951 F.2d at 230. The Ninth Circuit stated, "[p]rior court approval may make a claim for administrative expenses more palatable, but it is nowhere required in the Code." *Id.* at 232. However, this broad statement in *Palomar* may not be applied to all administrative expenses. The Ninth Circuit has consistently taken a different view as to professionals.

If a professional is to act on behalf of the bankruptcy estate, the bankruptcy court must approve the employment of the professional. *Okamoto v. THC Finc. Corp. (In re THC Fin. Corp.)*, 837 F.2d 389, 391–92 (9th Cir.1988); *DeRonde v. Shirley (In re Shirley)*, 134 B.R. 940, 943–44 (9th Cir. BAP 1992). The professional is not in a more favorable position, if the professional seeks Bankruptcy Court approval but the employment is not approved. *McCutchen, Doyle, Brown & Enersen v. Official Comm. of Unsecured Creditors (In re Weibel, Inc.)*, 176 B.R. 209 (9th Cir. BAP 1994). In the *Weibel* case, the Bankruptcy Appellate Panel stated that "[c]ompensation to professionals acting on behalf of the estate must be based on provisions of the Code. The Code does not

provide for fee awards based on state law theories such as quantum meruit." *Weibel,* 176 B.R. at 212. The *Weibel* Panel also cited with approval the earlier decision of *In re Shirley,* and noted:

> [C]ourt approval of the employment of counsel for a debtor in possession is *sine qua non* to counsel getting paid. Failure to receive court approval for the employment of a professional in accordance with § 327 and Rule 2014 precludes the payment of fees.

*Id.* at 211 (quoting *In re Shirley,* 134 B.R. at 943–44).

Since the law firm in *Weibel* never received bankruptcy court approval to act on behalf of the debtor in possession, it advanced the argument that it could be compensated pursuant to 11 U.S.C. §§ 330(a) and 503(b)(2) simply as the "debtor's attorney."[48] The Panel stated that Section 330 divided attorneys into two categories: those that were employed pursuant to Section 327 and those that served as the debtor's attorneys. Although Section 330 was amended in 1994 and deleted the reference in the preamble to "debtor's attorney," the *Weibel* analysis is still important in this Court's consideration of the transaction between a debtor in possession and its counsel.

A debtor in possession must act as a fiduciary, since it has control of the bankruptcy estate. 11 U.S.C. § 1107(a) (1996).[49] As to any professional employed by a debtor in possession, that professional is:

> expected to act only in the best interests of the estate. Therefore, court approval of its employment is necessary. If a debtor is not in possession, these same concerns do not come into play. Counsel for the debtor then, to the extent it gets involved in the case, represents the debtor and not the estate or the creditors. Therefore, court approval of employment is not necessary.

*Weibel,* 176 B.R. at 212.

The *Weibel* Panel concluded that there could be instances in which a debtor was not in possession, but the debtor's attorneys nevertheless conferred a benefit upon the estate for which the attorneys should be compensated. *Id.* (citing *In re Xebec,* 147 B.R. 518 (9th Cir. BAP 1992) (allowing debtor's counsel some compensation from estate although a trustee was in place)). Therefore, compensation may be only awarded under Section 330 to the "debtor's attorney" if the debtor is not in possession and the other requirements of Section 330 have been met. *Id.* at 212.

The *Weibel* Panel also considered whether a professional might seek compensation pursuant to 11 U.S.C. § 503(b)(1) to avoid the requirements of Section 503(b)(2) which only

---

**48.** At the time of the *Weibel* decision, Section 11 U.S.C. § 330(a)(1) provided as follows:

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title[.]

11 U.S.C. § 330(a)(1) (amended 1994). The 1994 amendments to Section 330 deleted the reference to "debtor's attorney" and, hence, drew into question the ability of said attorney in a chapter 7 proceeding to receive any compensation pursuant to Section 330.

Section 503(b)(2) further provides:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

.    .    .    .    .

(2) compensation and reimbursement awarded under section 330(a) of this title[.]

11 U.S.C. § 503(b)(2) (1996).

**49.** 11 U.S.C. § 1107(a) provides:

(a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a) (1996).

awards compensation to professionals pursuant to 11 U.S.C. § 330. The Panel concluded that since Subsections (b)(1) and (b)(2) of Section 503 would pose nearly identical tests *to a professional*, the specific provisions of Section 503(b)(2) must control. *Id.* at 213.[50] Therefore, the Panel refused to let the attorneys seek compensation pursuant to Section 503(b)(1).

■ In this case, the Debtors were always debtors in possession. Based upon principally the *Shirley* and *Weibel* decisions, the Firm could not act as a professional for the Debtors without obtaining Bankruptcy Court approval of the employment of the Firm. Because this Court's order denying employment of the Firm became a final order, the Firm was never able to obtain the requisite Court approval.

■ Notwithstanding, the Firm relies upon *Cristopher v. Mir (In re Boh! Ristorante, Inc.)*, 99 B.R. 971 (9th Cir. BAP 1989), for the proposition that so long as the Firm is being paid by a third party—in this case, potentially by Heller—the Court need not be concerned about employment issues and whether the Firm, as special counsel, has met the standards of 11 U.S.C. § 327(e). First, the Panel in *Boh! Ristorante* recognized that it was authorizing the payment of

fees and costs to debtor's counsel under "limited circumstances," so the effect of the decision has also been limited. *Boh! Ristorante*, 99 B.R. at 973. Next, the Panel stated that it was focusing on 11 U.S.C. § 329[51] and the debtor's transactions with its attorneys, rather than 11 U.S.C. § 330. However, subsequent decisions of the Panel, such as *Weibel*, have clarified that at least in chapter 11 cases, Section 330 pertains to a debtor in possession's transactions with its attorneys and an attorney seeking compensation pursuant to the Bankruptcy Code. Therefore, *Boh! Ristorante* has been limited in its application to only those cases involving debtors, not debtors in possession, that have retained counsel *and* the attorneys are not seeking compensation under *any provision* of the Bankruptcy Code.

The foregoing analysis is derived from the language of Sections 329 and 330. Section 330 provided prior to the 1994 amendments that it pertained to the "debtor's attorney" and to a professional employed under Section 327 or Section 1103. The current version of Section 330 pertains to professionals employed under Section 327 or Section 1103, or to the debtor's counsel in chapter 12 or chapter 13 cases. 11 U.S.C. §§ 330(a)(1) and (a)(4)(B).[52] Therefore, there has been no

---

**50.** Section 503(b)(2), incorporating § 330, permits reasonable compensation for "actual, necessary services rendered by" the attorney. 11 U.S.C. § 503(b)(2) (1996). Section 503(b)(1) provides for payment of administrative expenses of the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1) (1996).

**51.** 11 U.S.C. § 329 provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

11 U.S.C. § 329 (1996).

**52.** Section 330(a)(1) now provides:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1) (1996).

Section 330(a)(4)(B) now provides:

In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may

substantive change at least as to counsel for a chapter 11 debtor in possession, since a debtor in possession employs its counsel pursuant to the provisions of Section 327. Either version of Section 330 also incorporates the language that Section 330 is "subject to ... 329." In turn, Section 329 provides that it is applicable to all debtor's transactions with its attorneys "whether or not such attorney applies for compensation under this title." Of course, the reference to "title" is to Title 11 of the United States Code.

■ In this case, the Firm only had transactions with the Debtors as debtors in possession. Therefore, the *Weibel* and *Shirley* decisions mandate that any such professional obtain court approval for employment. It is undisputed that the Firm never obtained such approval; therefore, the Firm is not justified in believing it would be compensated for its services. *See Law Offices of Ivan W. Halperin v. Occidental Fin. Group, Inc. (In re Occidental Fin. Group, Inc.)*, 40 F.3d 1059 (9th Cir.1994); *First Interstate Bank of Nev., N.A. v. CIC Inv. Corp. (In re CIC Inv. Corp.)*, 192 B.R. 549, 552 (9th Cir. BAP 1996). As a result, the Firm should not be permitted to utilize Section 506(c) to circumvent the order of this Court denying employment.

The Firm also provided broad-based legal services, such as review and determination of whether certain leases should be assumed by the Debtors, analysis of a lender liability lawsuit against Heller, and determination of whether a preference lawsuit should be instituted against a principal of the Debtors. Compensation of an attorney rendering such broad-based legal services should be subject to the analysis of Section 330 and whether compensation is appropriate thereunder. The Firm has sought compensation under Section 506, which contains some of the elements of Section 330, but is also more expansive, including costs and expenses of individual creditors, not professionals. However, as the *Weibel* decision noted, the more specific

provision of the Code should control over the more general; that is, in this case, Section 330 should control over Section 506. Because the Firm concedes that it no longer seeks compensation pursuant to Section 330, it has effectively precluded this Court's approval of its compensation.

II. Whether Heller consented to the use of its collateral to pay the Firm's attorneys' fees and costs.

■ This Court has already concluded that the Firm did not meet any prong of the Section 506(c) test. However, the issue of whether Heller consented, expressly or impliedly, to a surcharge of its collateral really addresses only an exception to the third prong or "benefit" prong of the Section 506(c) test. Therefore, even if the Firm had met the "benefit" prong of the Section 506(c) test, it still would not be entitled to compensation.

On the consent issue, the Firm relies upon *In re Evanston Beauty Supply, Inc.*, 136 B.R. 171 (Bankr.N.D.Ill.1992), which states that a secured creditor may expressly or impliedly consent to the services being rendered to the creditor. Such consent is an exception to the "benefit" prong of the Section 506(c) test. *Evanston Beauty Supply*, 136 B.R. at 177. In addition, the Ninth Circuit decision of *Cascade Hydraulics* noted that, under the Bankruptcy Act, the secured creditor could consent to have certain administrative expenses paid from its collateral, and that such an exception had generally been codified in 11 U.S.C. § 506(c). *Cascade Hydraulics*, 815 F.2d at 548. Therefore, although not expressly stated by the Ninth Circuit, one may assume that consent by a secured creditor would be an appropriate exception to the direct benefit prong of the Section 506(c) test.

■ Heller did, at times, expressly and unconditionally consent to the use of its collateral to pay certain costs and expenses of

---

allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

11 U.S.C. § 330(a)(4)(B) (1996). Therefore, the revised § 330 only creates an ambiguity as to whether debtor's counsel in a chapter 7 proceeding may be compensated pursuant to Title 11. This Court is only focusing on chapter 11 proceedings.

administration. For instance, at the December 13, 1995 hearing before this Court, Heller's counsel specifically testified, and the record of this Court so reflects, that the Debtors' employees should be paid pursuant to a Section 506(c) surcharge. As to the Firm, however, any consent by Heller was limited or conditional. As previously discussed by this Court, the January 10 and 11, 1993 discussions between the Debtors' agent and a representative of Heller did not provide the requisite implied or express consent on the Section 506(c) surcharge issue.[53] The Interim Financing Order did provide a limited or conditional consent for a Section 506(c) surcharge; however, the Firm needed to obtain approval of its employment and its fees and costs before Heller was required to pay the Firm. The Firm did not obtain the requisite Court approvals.

III. Whether Heller is barred by the doctrines of waiver or estoppel from asserting any objection to the Firm's Section 506(c) surcharge.

■ The Firm argues that it is entitled to a surcharge under the doctrines of waiver and estoppel. The Firm initially relies on Heller's withdrawal of its objection to the Debtors' Application requesting compensation for the Firm as a form of waiver.

To reiterate, on July 30, 1993, the Debtors filed an application to compensate the Firm for postpetition services rendered and costs incurred predicated on an administrative expense pursuant to 11 U.S.C. §§ 503(b)(1) and (b)(4)[54] and a property surcharge pursuant to 11 U.S.C. § 506(c). On September 28, 1993, Heller filed a lengthy objection as to all relief requested by the Firm, including an objection to the relief requested under Section 506(c). On November 4, 1993, Heller filed a withdrawal of its objection. The Firm argues that Heller "intentionally and knowingly filed the withdrawal of its prior objection, thereby waiving its right to oppose the surcharge request."[55] However, as this

Court pointed out to the Firm's counsel at closing argument on December 13, 1995, withdrawal of a pleading is normally done without prejudice. Heller did not indicate to the Firm or the Court that the withdrawal was with prejudice or that Heller would no longer pursue the surcharge issue. The Court did not enter any order stating that the withdrawal was with prejudice. In fact, such an order would probably be improper in light of the Ninth Circuit decision of *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996) (holding that judge abused discretion in ordering that claim be withdrawn with prejudice when creditor was not prepared to go to trial on the scheduled date and time and told bankruptcy judge that it wished to withdraw its claim, pursue litigation in another forum and potentially reassert its claim in the bankruptcy proceedings at a later date depending on the outcome of related litigation).

In this case, Heller presented credible evidence that the withdrawal of the objection resulted from Heller's belief that the United States Trustee's Office in the District of Arizona would vigorously pursue its separate Comments, filed on September 29, 1993, to the July 30, 1993 Application filed by the Debtors to approve compensation to the Firm. Although the United States Trustee objected to the Firm's having its fees and costs approved and paid as any type of administrative expense of the bankruptcy estates, the *United States Trustee understandably took no position on the surcharge issue other than to note that she believed that a professional seeking compensation pursuant to Section 506(c) still needed to be employed pursuant to 11 U.S.C. § 327.* Therefore, Heller assumed the risk that the United States Trustee would be successful in its objection on the administrative expense issue *and that the Court would not enter a sepa-*

---

**53.** Given the recollection of Debtors' agent and the *subsequent letter by the Firm, the only issue* that was discussed was the potential payment of the Firm if it could show that it made a "substantial contribution" as a creditor to the Debtors' chapter 11 proceedings. *See* 11 U.S.C.

§§ 503(b)(3) and (b)(4). The Firm did not pursue this argument before this Court.

**54.** *See supra* note 15.

**55.** Docket Entry No. 938 at 2, lines 20–22.

*rate final order on the surcharge issue.* Ultimately, the Firm withdrew its request for any type of administrative expense, did not obtain a separate Court order on the Section 506(c) surcharge issue as to the Application, and filed its most recent Motion for Enforcement of Consensual Property Surcharge, thereby affording Heller the opportunity to object on just the discrete surcharge issue. Heller's risk assessment was correct. However, Heller's risk assessment does not lead to a valid claim that Heller waived certain rights against the Firm.

Next, the Firm relies upon the Ninth Circuit decision of *Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son),* 815 F.2d 1314 (9th Cir.1987), for the principle that estoppel applies to orders entered in bankruptcy proceedings. A party should not, through language and conduct, lead other interested parties to consent to the terms and conditions of a proposed order and, therefore, lead the Court to execute the order. *See Hink,* 815 F.2d at 1318. Of course, the Firm considers only the Interim Financing Order in its analysis. However, as this Court has previously noted, the Interim Financing Order required "approval" of the Firm's employment and the fees and costs before the fees and costs would be paid by Heller. All of the professionals, including the Firm, were seeking employment, at that time, pursuant to Section 327. It was reasonable for Heller and the Court to assume that employment was a part of the "approval" process. From this Court's standpoint, it was the *Firm's* responsibility, not Heller's, to notify this Court, if the Interim Financing Order did *not* require approval of the Firm's employment. If any party was not completely candid with the Court, it was the Firm. Therefore, it is difficult to award the Firm compensation on the basis of estoppel.

▉ Moreover, the Firm does not discuss this Court's order denying the Firm's employment in its analysis. This Court cautioned the Firm, by making statements on the record, that the Firm was at risk in rendering any services to the Debtors. Nevertheless, the Firm sought to circumvent this Court's order by attempting to enter into an "agreement" with Heller. This agreement was not as favorable as the Firm had hoped. However, this Court must seriously question any estoppel argument, when the party seeking equity has attempted to circumvent a specific Court order denying employment.

▉ The Firm also apparently makes an equitable estoppel argument on the basis that it caused the Debtors to withdraw the pending appeal of this Court's order denying the Firm's employment based upon the agreement entered into with Heller. Pursuant to *Heltzel v. Mecham Pontiac,* 152 Ariz. 58, 730 P.2d 235 (1986), Arizona law requires that the following elements be proven to establish equitable estoppel: (1) conduct by one which induces another to believe in certain material facts; and (2) the inducement results in acts in justifiable reliance thereon; and (3) the resulting acts cause injury.[56]

Even considering the *Heltzel* case, the Firm has not set forth the requisite facts to establish estoppel. The Firm had a limited agreement with Heller as a result of the January 10 and 11, 1993 discussions. On November 4, 1993, Heller withdrew its objection to the Application, but the withdrawal was without prejudice at a time when the United States Trustee was still pursuing her Comments. Based upon these limited facts, the Firm nevertheless elected to stipulate to dismissal of the appeal in June 1994 regarding the Firm's employment order. Heller did not induce the Firm to change its position. The Firm never requested that this Court enter any final order on the Application concerning the Firm's compensation. The Firm simply made an improper risk assessment. Therefore, when the Firm filed this Motion for Enforcement, it gave Heller the opportunity to address the Section 506(c) surcharge issue.

## V. *Conclusion*

This Court concludes that the Firm is not entitled to the payment of its attorneys' fees and costs by means of a Section 506(c) surcharge against Heller's collateral. This

**56.** *Heltzel,* 152 Ariz. at 61, 730 P.2d at 238.

Court will enter a separate order which is consistent with this Memorandum Decision.